# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| SEAN PARNELL, | ) | |
| | ) | |
| Plaintiff, | ) | No. 04 C 3739 |
| | ) | |
| v. | ) | Paul E. Plunkett, Senior Judge |
| | ) | |
| HOMETOWN DISTRIBUTING CO., INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sean Parnell ("Parnell") has sued Defendant Hometown Distributing Co., Inc.

("Hometown") for alleged retaliatory actions in violation of Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e-3(a). Before the Court is Hometown's motion for summary judgment. For the

reasons set forth below, Hometown's motion is granted in part and denied in part.

### Background

Unless otherwise noted, the following facts are undisputed or have been deemed admitted

pursuant to Local Rule 56.1, which this Court strictly enforces.[1] At all times relevant, Hometown

---

[1] Hometown objects to Parnell's inclusion of various documents as exhibits supporting his Local Rule 56.1 statement of additional facts on the ground that they lack foundation pursuant to Federal Rule of Evidence 901. The Court declines to adopt Hometown's position that these documents are inadmissible simply because Parnell submitted them in support of his response. Moreover, absent some specific indication that the authenticity of other documents submitted by Parnell are suspect, the Court will not deem them inadmissible for purposes of ruling this motion. *See Scott v. Pace Suburban Bus*, No. 01 C 1039, 2003 WL 1579166, at *5 (N.D. Ill. Mar. 23, 2003). To the extent Hometown objects on hearsay grounds, the Court notes that such statements are either irrelevant to the decision's outcome or have been admitted in Hometown's responses under Local Rule 56.1.

operated as an alcoholic beverage sales and distributorship in Chicago, Illinois. Def.'s LR 56.1(a)(3) ¶ 4. On or about October 20, 2000, Parnell, an African-American male, began working for Hometown as a sales team leader.[2] *Id.* ¶ 10. As a sales team leader, Parnell's numerous responsibilities included instituting and meeting sales goals both for himself as well as for the individual team members assigned to him, supervising and training those team members, ensuring quality control and providing customer service. *Id.* ¶ 12. Parnell was also expected to ride along with salesmen and drivers one to two times per month. *Id.*; Pl.'s LR 56.1(b)(3)(A) ¶ 8. For meeting these responsibilities, among other benefits, Parnell received a base salary as well as performance-based incentive bonuses tied to Parnell's ability to meet his own sales and distribution goals and his ability to ensure that his team members met their respective goals. Def.'s LR 56.1(a)(3) ¶ 13.

At some point toward the end of June 2002, Parnell attended a sales meeting at which time one of Hometown's two owners, Jim Taylor ("Taylor"), sought to increase the sales force's placement of Hometown's products into stores, known as "distribution."[3] Pl.'s LR 56.1(b)(3)(A) ¶ 39. Later that day, Parnell met with Mark White ("White"), Hometown's sales director at the time, in an attempt to determine how to increase distribution when the sales team no longer received money for promotions. *Id.* ¶ 41. White responded to Parnell's question by calling Harold Hollis to

---

[2]Though Parnell started working for Hometown in October 2000, it appears that Parnell did not begin immediately as team leader, instead receiving on the job training until approximately January 2001, at which time he was formally introduced to Hometown's employees as a team leader and assigned employees. *See* Pl.'s 56.1(b)(3)(A) ¶¶ 28-30.

[3]The parties dispute the extent of Taylor's distribution request/demand. Parnell contends that the "ultimatum" pertained to all of Hometown's products, while Hometown submits that Taylor referred only to one product distributed by Hometown. *See* Pl.'s LR 56.1(b)(3)(A) ¶ 39. Regardless of the extent of the "ultimatum," Parnell categorized distribution as "a high priority for Hometown" while Hometown admitted that "distribution was important at Hometown." *See id.* ¶ 40. Ultimately, the dispute is immaterial.

instruct Parnell as to how to avoid this problem. Def.'s LR 56.1 (a)(3) ¶ 17; Pl.'s LR 56.1(b)(3)(A) ¶ 42. After leaving White's office, Hollis guided Parnell through a process by which sales invoices were manipulated in order for it to appear that distribution was higher than in actuality. Def.'s LR 56.1(a)(3) ¶ 18; Pl.'s LR 56.1(b)(3)(A) ¶ 44. Shortly thereafter, Parnell informed his employees, Jay Cantu, Tom Perez and David Hawash, as to the invoice manipulation process he learned from Hollis, however, his team was already familiar with the process Def.'s LR 56.1(a)(3) ¶¶ 21-22; Pl.'s LR 56.1(b)(3)(A) ¶ 45.

Later that year, Hometown received a complaint from the Illinois Liquor Commission pertaining to the accuracy of Hometown's sales invoices. On December 18, 2002, Taylor, Terrence Bell ("Bell"), Hometown's other owner, and Jim McCoy, Hometown's controller, met with Hometown employees and informed them of the complaint. Def.'s LR 56.1(a)(3) ¶ 25; Pl's LR 56.1(b)(3)(A) ¶ 58. Bell considered the invoice manipulation to be a criminal act and believed that those employees involved could be prosecuted for their actions. Pl's LR 56.1(b)(3)(A) ¶ 68. Bell was also concerned that the actions put Hometown at risk for fines issued by the State of Illinois and jeopardized Hometown's relationship with one of its suppliers, Anheuser Busch. *Id.* Taylor stated that the practice was unauthorized and had to stop. Def.'s LR 56.1(a)(3) ¶¶ 26, 70, 72. Additionally, Taylor gave Hometown's employees a twenty-four hour window in which "to come clean." *Id.*

The next day, on December 19, 2005, Parnell and Hawash met with Bell to discuss the invoice manipulation process as well as their participation therein. Def.'s LR 56.1(a)(3) ¶ 28. In fact, Parnell and Hawash were the only Hometown employees coming forward with such information. Pl's LR 56.1(b)(3)(A) ¶ 86. Parnell informed Bell that he learned from Hollis that a number of sales teams were manipulating invoices, not just Parnell's team. *Id.* ¶ 82. Bell thanked

-3-

Parnell for coming forward with the information and told Parnell to take the rest of the day off. *Id.* ¶¶ 83, 85.

After the December 18th company-wide employee meeting, Hometown conducted an audit and found discrepancies between Hometown's own records and the records turned into the Illinois Liquor Commission by Hometown's customers. *Id.* ¶¶ 59, 61. As a result of the investigation, Taylor and Bell decided that all employees who participated in manipulating invoices would not receive their quarterly bonuses. Def.'s LR 56.1(a)(3) ¶ 31. However, though bonuses were initially withheld, they were later reinstated and Parnell was among the employees whose bonuses were reinstated. *Id.* ¶ 34.

Thereafter, on January 17, 2003, Hometown circulated a company-wide memorandum, drafted by Taylor and Bell, which provided:

> At Hometown we value employee loyalty and honesty and give credit where due. Last December, we took certain actions in response to a problem brought to our attention by certain loyal employees. Had it not been discovered, the wrongdoing had potential serious ramifications for the company. The persons who did come forward are to be commended for their loyalty and honesty to Hometown.

Pl's LR 56.1(b)(3)(A) ¶ 107. Hometown admits that the "loyal employees" referred to in the memorandum pertained to Parnell and Hawash. *Id.* ¶ 107.

Yet, notwithstanding his classification as a "loyal employee" in Hometown's January 17th memorandum, on February 17, 2003, Parnell received a reprimand letter from Hometown, reflecting Bell and Taylor's belief that Parnell knew about and/or participated in manipulating invoices. Def.'s LR 56.1(a)(3) ¶ 36; Pl's LR 56.1(b)(3)(A) ¶ 111. The letter further informed Parnell that discovery of similar conduct would constitute grounds for immediate dismissal. Def.'s LR 56.1(a)(3) ¶ 36. Parnell responded by submitting a letter, in which he acknowledged receipt of the letter but objected

-4-

to the reprimand by asserting that he was following the instructions of Hometown's sales director, Mark White.[4] Pl's LR 56.1(b)(3)(A) ¶ 112. Bell testified that he did not consider Parnell as being out of line for his note and was not upset that he received it. *Id.* ¶ 113.

Though denied by Parnell, Hometown argues that it was around this time where Parnell's "management and performance level at Hometown diminished." Def.'s LR 56.1(a)(3) ¶ 38. Specifically, Hometown asserts Parnell started receiving complaints, written reprimands and counseling. Parnell denies the assertion only as to the counseling. *Id.* ¶ 37. First, on February 20, 2003, Parnell received a second reprimand, this time for his failure to attend a mandatory new product "roll-out" meeting the day before.[5] *Id.* ¶¶ 41-42; Pl's LR 56.1(b)(3)(A) ¶ 114. Second, on March 4, 2003, Parnell had a verbal altercation with one of Hometown's supervisors, Jerry Bullock. Def.'s LR 56.1(a)(3) ¶ 43; Pl's LR 56.1(b)(3)(A) ¶ 121. However, Hometown did not formally discipline Parnell for the altercation. Pl's LR 56.1(b)(3)(A) ¶ 121. Finally, at the beginning of April 2003, Parnell received another reprimand for violating Hometown's "freshness" policy, *i.e.,* stale beer, at an account managed by Parnell and serviced by his team. Def.'s LR 56.1(a)(3) ¶¶ 46-47. From April 8, 2003 until the time of his discharge, Parnell received no further discipline. Pl's LR 56.1(b)(3)(A) ¶ 158.

Hometown further argues that it was also around this time that Bell and Taylor "created a restructuring plan for Hometown's sales force designed to correct Hometown's sales and distribution problems and improve sluggish profit." Def.'s LR 56.1(a)(3) ¶ 49. It is undisputed that by late

---

[4]Hometown discharged White on January 2, 2003. Pl's LR 56.1(b)(3)(A) ¶ 38.

[5]In addition to Parnell, Hometown reprimanded two other employees for their failure to attend the roll-out meeting. Pl's LR 56.1(b)(3)(A) ¶ 115. Yet, in response to Parnell's Local Rule 56.1 statement of facts, Hometown admitted that Parnell and the other employees were unaware of the meeting. *Id.*

March and early April 2003, Hometown was experiencing flat and stagnant sales and distribution of its products. *Id.* ¶ 48. The plan sought to eliminate certain positions, both managerial and support staff, as well as consolidate sales personnel. *Id.* ¶ 50. In accordance with the plan, Taylor testified that he decided to change Parnell from team leader to a sales position in late March or early April 2003. *Id.* ¶ 52. Around this same time, Hometown contends that it informed Tony Toliver, a salesman with Hometown, that he would be promoted to team leader. *Id.* ¶ 55. While Parnell does not dispute that Hometown sought to restructure the company, Parnell disputes the timing of implementing the plan as well as the fact that Hometown informed Toliver of its decision to promote him in March or April, arguing that Hometown's restructuring process took no more than a month, which began in either late April or early May 2003. Pl's LR 56.1(b)(3)(A) ¶ 147. Regardless of its beginning, Parnell contends that Hometown's restructuring became effective during the first week of June 2003. *Id.* ¶ 151.

On May 5, 2003, Parnell filed his first charge with the EEOC.[6] Def.'s LR 56.1(a)(3) ¶ 56; Pl's LR 56.1(b)(3)(A) ¶ 126. In the charge, Parnell claimed he was disciplined for his participation in manipulating invoices, while Hometown's white employees were not. Def.'s LR 56.1(a)(3) ¶ 56. Moreover, he asserted that he was harassed for protesting to the same. *Id.* Hometown acknowledges that it received notice of Parnell's May 5th charge no later than Friday, May 9, 2003. Pl's LR 56.1(b)(3)(A) ¶ 131. In response, though disputed by Hometown, Parnell claims that Hometown thereafter terminated his employee access code or password prior to his arrival to work on Monday, May 12, 2003. *Id.* ¶ 138. While Hometown denies that Parnell could not access the computer

---

[6]On September 27, 2003, the EEOC dismissed Parnell's discrimination charge, finding that based on its investigation, the EEOC was "unable to conclude that the information obtained establishes violations of the statutes." Def.'s Mot. Summ. J. Ex. 26.

system that day, it concedes that his password may have been malfunctioning, adding that he was nevertheless able to gain access to the sales information through another employee. *Id.* ¶ 138.[7]

Subsequently, on Tuesday, June 3, 2003, Parnell met with Bell and Tony Toliver in Bell's office, whereupon Bell announced to Parnell that Hometown planned on restructuring various jobs at Hometown.[8] Def.'s LR 56.1(a)(3) ¶ 58. Bell informed Parnell that he would no longer work as a team leader and instead would be demoted to salesman, whereupon Toliver would assume Parnell's former position. While Hometown asserts that Parnell left the meeting without being excused, Parnell contends otherwise. *Compare id.* ¶ 59 *with* Pl's LR 56.1(b)(3)(A) ¶¶ 162-63. Although the parties dispute whether Parnell was actually demoted that day, it is clear that Parnell left work early in order to file another charge with the EEOC, alleging that his demotion was in retaliation for his filing of the May 5th EEOC charge. Def.'s LR 56.1(a)(3) ¶ 62; Pl's LR 56.1(b)(3)(A) ¶¶ 166-67. Hometown received a copy of Parnell's second EEOC charge sometime on Friday, June 6, 2003, though the exact time is unclear. Pl's LR 56.1(b)(3)(A) ¶ 176. However, while Hometown received the charge on June 6th, Hometown contends that Taylor did not receive or review the charge before June 11, 2003. *See* Def.'s LR 56.1(a)(3) ¶ 70; Resp. to Pl's LR 56.1(b)(3)(A) ¶ 202.

Hometown asserts that Bell and Taylor decided to terminate Parnell on Wednesday, June 4, 2003, rather than restructure him to a sales position, "based upon all of Parnell's prior problems, including the manipulation scheme, and Bell's belief that Parnell had abandoned his job by leaving

---

[7]In his statement of additional facts, Parnell contends that he spoke with Hometown's computer systems manager, Paul Williams "on at least 4 or 5 occasions and never had the issue resolved." Pl.'s LR 56.1(b)(3)(A) ¶ 146. In response, Hometown denies that Parnell contacted Williams about his computer system problem.

[8]While Parnell disputes Hometown's characterization of his demotion as "job restructuring," he has himself referred to it as a restructuring. *See, e.g.,* Pl's LR 56.1(b)(3)(A) ¶¶ 147, 151.

the June 3, 2003 meeting and not coming to work or contacting Hometown on June 4, 2003." Def.'s LR 56.1(a)(3) ¶ 65. However, Parnell disputes this assertion. Regardless, Hometown did not send him his termination notice until June 6, 2003, the same day Hometown appears to have received a copy of Parnell's second EEOC charge. *See* Pl's LR 56.1(b)(3)(A) ¶ 176. After his termination, on July 8, 2003, Parnell filed a third charge with the EEOC, alleging that his termination was in retaliation for his filing of his prior EEOC charges. Def.'s LR 56.1(a)(3) ¶ 71.

After receiving his right to sue letter on March 31, 2004, Parnell timely filed a one-count complaint against Hometown on June 1, 2004, seeking relief pursuant to 42 U.S.C. § 2000e-3(a) for Hometown's allegedly retaliatory acts. *See* Compl. ¶ 3. Thereafter, on October 21, 2005, Hometown moved for summary judgment.

## Legal Standard

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). At this stage, the Court does not weigh evidence or determine the truth of the matters asserted. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Significantly, the Court views all evidence and draws all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

In addition, where "undisputed facts give rise to disputed inferences," summary judgment

is not appropriate. *Harley-Davidson Motor Co., Inc. v. Powersports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003) ("[T]he choice between reasonable inferences from facts is a function of the fact-finder."). *See also Ramirez v. The Nutrasweet Co.*, No. 95 C 0130, 1997 WL 684984, at *7 (N.D. Ill. Oct. 27, 1997) ("[I]f the evidence presented by the parties is subject to conflicting interpretations, or if reasonable minds could differ as to its significance, summary judgment must not be granted.") (citing *O'Connor v. Chicago Transit Auth.*, 985 F.2d 1362, 1366 (7th Cir. 1993)).

## Discussion

Pursuant to Title VII, an employer may not retaliate against an employee who has "opposed any practice made an unlawful employment practice by this subchapter or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). "[U]nlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). In order to establish a *prima facie* case for retaliation, Parnell has two methods available: the direct method and the indirect method. *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 529 (7th Cir. 2003). Because Parnell contends that he can set forth a *prima facie* case for retaliation under the direct method, see Pl.'s Resp. Mot. Summ. J. at 2, the Court will begin its analysis with that method.

# I.    Direct Method.

Under the direct method, Parnell must show: "(1) that [he] engaged in a statutorily protected activity; (2) that [he] suffered an adverse employment action and (3) there was a causal link between the protected expression and the adverse action." *Culver v. Gorman & Co.,* 416 F.3d 540, 545 (7th Cir. 2005). The Court examines each element in turn.

## A.    *Statutorily Protected Activity.*

First, Parnell must show that he engaged in a statutorily protected activity. *See Culver,* 416 F.3d at 545. Since the parties do not dispute that Parnell's May 5, 2003 discrimination charge and his June 3, 2002 charge for retaliatory demotion constitute statutorily protected activity, the Court focuses on the second and third elements listed above. *See* Def.'s Mem. Mot. Summ. J. at 4-5; Pl.'s Resp. Mot. Summ. J. at 3.

## B.    *Adverse Employment Action.*

Second, Parnell must show that he suffered an adverse employment action. *See Culver,* 416 F.3d at 545. In this case, Parnell filed a one-count complaint alleging two separate adverse employment actions by Hometown. *See generally* Compl. ¶¶ 1-19. In both his complaint and response to Hometown's motion for summary judgment, Parnell claims that his demotion from team leader to salesman was in retaliation for the filing of his May 2003 charge. He also contends that his termination was in response to the filing of his second, June 2003 charge. Apparently conceding that Parnell's termination was an adverse employment action, Hometown maintains that Parnell did not suffer an adverse action based on the demotion because it terminated Parnell prior to his

-10-

demotion taking effect. *See* Def.'s Mem. Supp. Summ. J. at 5. Thus, by Hometown's logic, since Parnell was not materially harmed he did not suffer an adverse employment action. However, as to this issue, Parnell has set forth sufficient facts to preclude summary judgment.

"Typically, adverse employment actions are economic injuries." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005) (quoting *Markel v. Bd. of Regents of Univ. of Wisc. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002)). While economic injuries may exemplify adverse employment actions, such actions are "not limited solely to loss or reduction of pay or monetary benefits" as they "can encompass other forms of adversity as well." *Id.* (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). Regardless of the form of the adverse action, it "must materially alter the terms and conditions of employment." *Id.* Importantly, as the Seventh Circuit has recognized, "[t]here is no question that demotion may be a materially adverse employment decision, whether that demotion is manifested by formal downgrade or by informal actions such as 'a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 876 (7th Cir. 1999) (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993).

In *Ajayi v. Aramark Business Services, Inc.*, 336 F.3d 520 (7th Cir. 2003), the Seventh Circuit considered whether a demotion which was threatened but ultimately never implemented could constitute an adverse employment action. In considering whether the plaintiff-employee could establish that she suffered an adverse employment action, the court noted that although "a demotion is a paradigm adverse employment action" the plaintiff-employee "could not establish that she suffered an adverse employment action here because she, in fact, never was demoted." *Id.* at 531.

Indeed, while the plaintiff-employee received a memorandum from her employer that she would be demoted two weeks after she received the memorandum, the demotion never actually happened and she continued to work in her position for the next several months. *Id.* at 524. As a result, the court affirmed the district court's grant of summary judgment after reiterating that "[a]n unfulfilled threat, which results in no material harm, is not materially adverse." *Id.*

While the demotion never occurred in *Ajayi* because the employer did not carry out its initial threat, Parnell presented evidence consistent with his position that Hometown took steps to demote him. First, in responding to Parnell's statement of facts, Hometown admitted that Toliver assumed some of Parnell's duties as team leader on June, 3, 2003, the same day Hometown informed Parnell that he would be demoted. Pl.'s LR 56.1(b)(3)(B) ¶ 155. The next day, Parnell appeared at a sales meeting with members of Toliver's sales team on June 4, 2003. *Id.* ¶ 187. During the meeting, Parnell viewed a "route book" with his name on it, detailing what Hometown asserts "his new route would eventually be" while denying that he was ever assigned to any particular sales route. *Id.* Finally, Hometown admitted that as Parnell visited various accounts with Hawash on June 4, 2003, Parnell received a telephone call from Toliver, who asked Parnell "if he needed anything on his laptop because they were getting ready to wipe it off." *Id.* ¶ 191. Parnell responded negatively. *Id.* This admission is significant because when Hometown hired Parnell as a team leader, he received a laptop which enabled him (and selected other employees such as management, team leaders, owners, administrators and operation managers), to access various Hometown sales information on the company's computer network. *Id.* ¶¶ 134-35. Thus, the loss of his laptop privileges is factually consistent with Parnell's argument that Hometown actually demoted him. Consequently, when viewed together, the above evidence creates a genuine issue of material fact as to whether Parnell

-12-

was actually demoted from his position as team leader to salesman prior to his termination, particularly when viewing the facts in a light most favorable to Parnell as the non-movant.

Moreover, even if this Court were to accept Hometown's argument as to the demotion, which it does not, Hometown cannot avoid the fact that it ultimately terminated Parnell, which "certainly qualifies as an adverse employment action." *Haywood,* 323 F.3d at 531. As such, the Court finds that Parnell can establish this element of his *prima facie* case.

### C. Causal Connection Between The Protected Activity and The Adverse Employment Action.

The final element Parnell must meet in order to show a *prima facie* case for retaliation under the direct method requires him to show a causal relationship between the filing of his EEOC charges and his demotion or termination. "A causal link between the protected expression and an adverse employment action may be established by showing that the protected conduct was a substantial or motivating factor in the employer's decision." *Culver,* 416 F.3d at 545 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)). "A motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." *Id.* (quoting *Spiegla v. Hull,* 371 F.3d 928, 942 (7th Cir. 2004)).

Parnell begins his argument for causation by contending that the testimony from Diana Ascencio, an employee in Hometown's human resources department, in which she provided that Taylor was "definitely not happy" about Parnell's filing of a discrimination suit, "provides some direct evidence of causation." Pl.'s Resp. Mot. Summ. J. at 4. However, Parnell's purported "direct evidence" falls short of what the law classifies as direct evidence. Direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus."

-13-

*Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005). Thus, even if Taylor was "definitely not happy" about Parnell's charge, the statement is not direct evidence because it would still requires a jury to infer that Taylor's negative view of Parnell's discrimination charge caused Taylor to take an adverse employment action. *See id.* As a result, to set forth a *prima facie* case, Parnell must rely on circumstantial evidence, "i.e., evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir. 2003). Such evidence is sufficient if it creates "a "mosaic" of circumstantial evidence that *directly* points to a discriminatory intent." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 786 (7th Cir. 2004) (emphasis added).

Parnell argues that there is "abundant circumstantial evidence to establish a causal connection," specifically citing to (1) the denial of access to Hometown's computer system within seven days of filing his first EEOC charge, (2) his demotion within twenty-nine days after the filing of that charge, and (3) his termination within thirty-two days of the first charge and three days after his second charge. *See* Pl.'s Resp. Mot. Summ. J. at 4. As a result, he maintains that "[t]he close proximity of these events is sufficient to establish a *prima facie* case." *Id.*

However, in *Stone v. City of Indianapolis Public Utilities Division,* 281 F.3d 640, 644 (7th Cir. 2002), the Seventh Circuit reminded courts and litigants "that mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." While this does not mean that close temporal proximity is irrelevant, rather, it simply means that "a short period of time between the filing of a charge of discrimination and an allegedly retaliatory action is rarely enough *by itself* to create a triable issue." *Lang v. Ill. Dept. of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir.

2004) (emphasis added). Indeed, "the timing of events is often an important evidentiary ally of the plaintiff." *Id.*

In this case, Parnell filed his first charge with the EEOC on May 5, 2003, alleging discrimination. Twenty-nine days later, on June 3, 2003, Parnell was informed of his demotion and then terminated three days later. *See supra* at 10-12 (discussing Parnell's demotion as an adverse employment action). On one hand, the time between Parnell's May 5th EEOC charge and either his June 3rd demotion or his June 6th termination is not evidence of causation as time between the protected activity and the allegedly retaliatory conduct is too attenuated to create a suspicion of a causal connection. *See Contreras v. Suncast Corp.,* 237 F.3d 756, 765 (7th Cir. 2001) (declining to find a causal connection based simply on a 26 day temporal relation between protected conduct and allegedly retaliatory action as insufficient to survive summary judgment). *See also Davidson v. Midelfort Clinic,* 133 F.3d 499 (7th Cir. 1998) (noting that as the time between the protected activity and adverse action increases, the suspicion of causation weakens). On the other hand, Parnell's June 6th termination, within three days filing of his second EEOC charge on June 3, 2003, does create a suspicion of a causal connection. *See Culver,* 416 F.3d at 546 (finding significant the fact that the plaintiff-employee was terminated three days after her initial complaint of discrimination).

In addition to suspicious timing as to his termination, Parnell must present "other circumstances . . . which reasonably suggest that the two events are somehow related to one another." *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.,* 277 F.3d 882, 895 (7th Cir. 2001). Specifically, to support his position that he has presented "abundant 'other evidence' which supports the inference of a causal link," Parnell relies on the following: (1) Hometown's Position Statement to the EEOC, in which Hometown noted that Parnell's demotion

-15-

was only "a possibility" and not a conclusion as of March or April 2003, (2) testimony from Taylor and Tom DeMatteo that Hometown's restructuring occurred in late April or early May 2003; (3) the fact that Hometown did not change Toliver's payroll records until June 16, 2003, even though "Tolliver's [sic] personnel file shows that virtually every salary change or position change for Tolliver [sic] was made *on or prior to* its effective date" (emphasis in original); (4) that his personnel file contains no payroll change notice reflecting a change from team leader to salesman, and; (5) that Parnell was the only team leader demoted to salesman in the restructuring, even though his sales were up. *See* Pl.'s Resp. Mot. Summ. J. at 5-6.

However, the Court does not find that Parnell's "other evidence" would enable a jury to conclude that his protected activity was a motivating factor for either his demotion or termination. Significantly, this is not a case where Hometown's decisionmakers, Bell or Taylor, referenced Parnell's EEOC charges when demoting or terminating him. *See Ajayi*, 336 F.3d at 533. Nor is this a case where Parnell's demotion or termination followed closely after a performance evaluation in which his supervisors agreed that Parnell was meeting or exceeding their expectations, or where it appears that Hometown was suddenly dissatisfied with Parnell after May 5, 2003, the date of his first EEOC charge. *Culver*, 416 F.3d at 546. If anything, Parnell's "other evidence" shows that Hometown was already considering demoting Parnell prior to the time he engaged in any protected activity. Accordingly, the Court finds that Parnell is unable to establish a causal connection between his protected activities and adverse employment actions, thus his attempt to establish a *prima facie* case under the direct method fails.

## II.    Indirect Method.

The second method available to Parnell is the indirect method. In order to present a *prima facie* case for retaliation under the indirect method, Parnell must show that "(1) [he] was a member of a protected class; (2) [he] was meeting [his] employer's legitimate job expectations; (3) [he] suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably." *Haywood*, 323 F.3d at 530. Unlike the direct method, the indirect method does not require Parnell to show a causal connection between the protected activity and the adverse employment action. *Id.* at 531. As conceded or previously determined, Parnell engaged in a statutorily protected activity when he filed his charges with the EEOC and suffered adverse employment actions by virtue of his demotion and termination. As a result, the Court focuses its review on the issues of (1) whether Parnell has shown that he was meeting performance expectations and (2) whether a similarly situated employee who did not file a charge was subjected to an adverse employment action.

However, before addressing whether Parnell has established a *prima facie* case under the indirect method, the Court reviews Hometown's declaration that Parnell forfeited use of the indirect method because of his alleged failure to amend his answers to interrogatories issued pursuant to Federal Rule of Civil Procedure 33. Specifically, in two separate interrogatories - one pertaining to his demotion, the other to his termination - Hometown asked Parnell to provide facts supporting "Parnell's claim that a similarly situated employee who did not complain was not subjected to [an] adverse employment action," further asking him to identify such an employee and facts supporting his position that the employee is similarly situated. *See* Def.'s Reply Supp. Mot. Summ. J. at 16-17. Parnell responded to such requests as follows: "No such claim is made in the Complaint." *See id.*

-17-

As a result, Hometown states that it "did not conduct discovery on similarly situated employees or Hometown's expectations of Parnell." *Id.* Now, Hometown seeks to preclude Parnell from presenting such evidence, citing to Rule 37(c)(1) of the Federal Rules of Civil Procedure.

Pursuant to Rule 37(c)(1), "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." FED. R. CIV. P. 37(c)(1). As is clear, Rule 37(c)(1) provides a remedy for a party's failure to disclose information as required by Rule 26(a) or for a party's failure to supplement such disclosures pursuant to Rule 26(e)(1). *See* FED. R. CIV. P. 37(c)(1). Thus, Rule 37(c)(1) is inapplicable to situations where a party's obligation to disclose arises under other discovery rules, *e.g.*, Rule 33. *Id. See also Naditch v. Banque De Gestion Privee-SIB*, No. 92 C 5290, 1995 WL 117872, at *3 (N.D. Ill. Mar. 15, 1995) (agreeing with a defendant's argument that Rule 37(c)(1) was inapplicable in a case where an obligation to disclose discovery material arose under Federal Rule 33).

Instead, the appropriate remedy for a party's failure to respond fully to obligations arising from formal discovery requests such as Rule 33 is found in Rule 37(a)(2)(B), which requires the filing of a motion to compel production to remedy such a failure. *See Naditch,* 1995 WL 117872 at *3. Because Hometown did not move this Court to compel an answer, Hometown has not availed itself of the appropriate remedy. *See* FED. R. CIV. P. 37(a)(2)(B). Moreover, Hometown has not certified that it "has in good faith conferred or attempted to confer with [Parnell] in an effort to secure the information or material without court action." *Id.* As a consequence, Parnell is not precluded from presenting evidence concerning similarly situated individuals, particularly when that

information is already in Hometown's possession as the employer of such "similarly situated" individuals. Accordingly, the Court turns to its discussion of the above mentioned issues.

### A.   *Meeting Performance Expectations*.

Under this prong, Parnell "must show that [he] was meeting expectations at the time of [his] termination." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) (citing *Peters v. Renaissance Hotel Operating Co.,* 307 F.3d 535, 545 (7th Cir.2002)). Parnell argues that the "record contains substantial evidence that Parnell met Hometown's legitimate expectations for employment." Pl.'s Resp. Mot. Summ. J. at 13. Specifically, he relies on (1) testimony from Tom DeMatteo that he had no problems with Parnell's performance in 2003 and that Hometown's owners, Bell and Taylor, did not have any conversations with him as to such performance; (2) evidence that his sales numbers and distribution "were up, and acceptable to Hometown" and; (3) the fact that neither his failure to attend the product "roll out" meeting on February 20, 2003, nor his early April 2003 reprimand for stale beer, were identified as a basis for his termination. *Id.* at 13-14.

In its reply brief, Hometown responds by denying that Parnell "met Hometown's legitimate expectations as a Team Leader," relying on Parnell's three reprimands spanning from February to April 2003 and Parnell's departure from his June 3, 2003 meeting with Bell and Toliver as evidence for this Court to "conclude that such acts directly contradict Parnell's assertions of meeting Hometown's legitimate expectations." *See* Def.'s Reply Supp. Mot. Summ. J. at 17. However, summary judgement as to this element of Parnell's *prima facie* case is precluded by Hometown's own admissions in response to Paragraph 226 of Parnell's Local Rule 56.1 statement of additional facts. With its sole objection pertaining to Parnell's own conclusion "that his sales were up almost

-19-

one percent,"[9] Hometown admitted that Parnell's "sales volume and sales distribution levels were

satisfactory to Hometown," that "Bell did not have a problem with Parnell's sales volume," although

he did not consider Parnell's sales "outstanding," and that Parnell "was 'performing moderately'

with his sales 'up slightly' while Hometown's sales were declining." *See* Hometown's Resp. to Pl.'s

226. Accordingly, based on Hometown's admission, the Court finds that Parnell has shown that he

was meeting performance expectations at the time of his demotion and termination. Thus, the Court

will turn to see whether Parnell has alleged that a similarly situated employee who did not file a

charge was subjected to an adverse employment action.


### B.   *Similarly Situated Employees.*

In order to demonstrate "that another employee is 'similarly situated,' a plaintiff must show

that there is someone who is directly comparable to [him] in all material respects." *Patterson v.

Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (internal quotation omitted). "In

evaluating whether two employees are directly comparable, the court must look at all relevant

factors, including whether the employees '(i) held the same job description, (ii) were subject to the

same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience,

education, and other qualifications-provided the employer considered these latter factors in making

the personnel decision.'" *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (quoting

*Ajayi*, 336 F.3d at 532). "This type of showing normally entails that the 'two employees dealt with

the same supervisor, were subject to the same standards, and had engaged in conduct without such

---

[9]Hometown's specific response was as follows: "Object to Parnell's conclusions that his
sales volume was up one percent. There is no foundation for these conclusions and they are
inadmissible. Admit remaining facts." Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) ¶ 226 (internal
citations omitted).

differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Roney v. Ill. Dept. of Transp.*, 376 F.Supp.2d 857, 872-73 (N.D.Ill. 2005) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000)). Importantly, Parnell must show that those similarly situated individuals were treated more favorably.

Parnell makes his argument by citing to four Hometown employees: Brian Visser, Tom DeMatteo, Mike McTeague and Tony Toliver. Pl.'s Resp. Mot. Summ. J. at 14-15. However, the Court notes that three of the four employees, Tom DeMatteo, Mike McTeague and Tony Toliver, are not "similarly situated" because they did not "hold the same or equivalent positions" as Parnell, nor did they deal with the same supervisor. *See Roney*, 376 F.Supp.2d at 873; *Patterson,* 281 F.3d at 680. Rather, these employees held either superior or inferior positions to Parnell. First, though there seems to be some dispute as to the exact characterization of Tom DeMatteo's position, it is clear that DeMatteo performed some form of supervisory role over Parnell, whether as Parnell's supervisor, as characterized by Parnell, or merely as a "go between" between Parnell and Hometown's management, as asserted by Hometown. *See* Pl's LR 56.1(b)(3)(A) ¶ 3. Under either characterization it does not appear that DeMatteo could be considered Parnell's peer. Second, both Tony Toliver and Mike McTeague were employed as salesmen by Hometown in May and June 2003. *Id.* ¶¶ 4, 6. As a team leader, Parnell served as a supervisor to salesmen. *See* Def.'s LR 56.1(a)(3) ¶ 12. Thus, because Toliver and McTeague both held inferior positions when compared to Parnell, they cannot be considered "similarly situated."

However, the Court finds that Parnell has set forth a similarly situated employee in Brian Visser. Both Parnell and Visser were team leaders and both reported in some way to DeMatteo. Pl's LR 56.1(b)(3)(A) ¶ 3. Moreover, Parnell has presented evidence, though denied by Hometown, that

Visser falsified sales invoices but was not disciplined, thereby creating a factual issue as to whether Visser falsified invoices. *Id.* ¶¶ 98-99. Moreover, like Parnell, Visser received a reprimand for his failure to attend the new product "roll out" meeting in February 2003. *Id.* ¶¶ 114-15. As such, the Court finds Parnell can meet this element of his *prima facie* case.

**III.    Legitimate Non-Discriminatory Reasons For Parnell's Demotion And Termination.**

Because Parnell has set forth a *prima facie* case for retaliation, the burden of production shifts to Hometown "to present evidence of a non-invidious reason for the employment action at issue." *Mannie,* 394 F.3d at 984. First, as to Parnell's demotion, Hometown avers that it "would have changed Parnell's job regardless whether an EEOC Charge was filed" due to the combination of Hometown's financial troubles and its owners' belief Parnell's subordinates lost confidence in him as their team leader. *See* Def.'s Mem. Supp. Mot. Summ. J. at 11. Moreover, as to Parnell's termination, Hometown provides that Parnell's termination "followed what was perceived as months of management issues with a Hometown manager." *Id.* at 14. Specifically, Hometown contends that Parnell's numerous reprimands, his verbal altercation with Jerry Bullock and Bell's belief that Parnell left the June 3, 2003 meeting without being excused - the "straw that broke the camel's back" - culminated in his termination. *Id.* at 13-14. *See also* Defs.' LR 56.1(a)(3) ¶ 65 (noting that the decision to terminate Parnell "was based upon all of Parnell's prior problems, including the manipulation scheme, and Bell's belief that Parnell had abandoned his job by leaving the June 3, 2003 meeting and not coming into work or contacting Hometown on June 4, 2003"). As a result, the Court finds that Hometown has offered legitimate, non-discriminatory reasons for Parnell's demotion and termination. Because Hometown's burden is merely that of production, Hometown

shifts the burden back to Parnell to show that Hometown's reasons are pretextual. *See Santelli v. Electro-Motive, a Div. of Gen. Motors Corp.*, 136 F.Supp.2d 922, 935 (N.D. Ill. 2001). *See also Mannie*, 394 F.3d at 984.

## IV.    Pretext.

"To demonstrate pretext, [Parnell] must demonstrate that [Hometown's] articulated reason[s] for its actions either: 1) had no basis in fact; 2) did not actually motivate its decision; or 3) was insufficient to motivate its decision." *Grayson v. O'Neill,* 308 F.3d 808, 820 (7th Cir. 2002) (citing *Velasco v. Illinois Dept. of Human Serv.,* 246 F.3d 1010, 1017 (7th Cir.2001)). "Pretext means a dishonest explanation, a lie rather than an oddity or an error." *Ballance v. City of Springfield,* 424 F.3d 614, 617 (7th Cir. 2005). It also "requires more than showing that the decision was mistaken, ill considered or foolish, [and] so long as [the employer] honestly believes those reasons, pretext has not been shown." *Id.* (alteration in original) (internal quotations omitted).

### A.    *Parnell's Demotion.*

As evidence that Hometown lied about its reasoning for his demotion, Parnell first argues that Hometown has given different reasons for his demotion. Parnell compares Hometown's EEOC Position Statement, in which Hometown cited as reasons for Parnell's demotion as Hometown's restructuring, Parnell's participation in manipulating invoices and loss of confidence in him by his subordinates, with his Local Rule 56.1 statement of facts, in which Hometown included two more reasons: Parnell's insubordination to Jerry Bullock and his multiple reprimands. *See* Pl.'s Resp. Mot. Summ. J. at 7. Thus, Parnell argues that according to *Culver v. Gorman & Co.,* 416 F.3d 540

(7th Cir. 2005), "such *additional* reasons given by an employer after litigation has commenced to permit an inference of pretext." *Id.* (citing *Culver*, 416 F.3d at 549) (emphasis added).

However, Parnell appears to have misinterpreted *Culver*, particularly as to the case's applicability in situations where the employer's proffered reasons for an adverse employment action are incongruous but not contradicting. In *Culver*, at the time of her termination, the employee asked her supervisor to explain why she had been terminated. *Culver*, 416 F.3d at 544. Her supervisor responded by saying that there were "issues." *Id.* However, it was not until the filing of the motion for summary judgment when the employer referred to specific incidents which occurred immediately prior to the employee's termination. *Id.* Thus, the Seventh Circuit found a discrepancy between the decisionmaker's initial failure to give *any* reasons for the employee's termination and the employer's subsequent articulation of specific reasons for the termination at summary judgment. *Id.* at 549. Accordingly, the court reiterated based on previous case law that "[a]n *inconsistent* employer explanation may help to support a finding of pretext." *Culver*, 416 F.3d at 549 (citing *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 678 (7th Cir. 2003)) (emphasis added).

While *Culver* involved a more subtle factual inconsistency, less subtle examples of inconsistencies were found in *Zaccagnini*, cited both by the *Culver* court and by Parnell, and in *Appelbaum v. Milwaukee Metropolitan Sewerage District.*, 340 F.3d 573 (7th Cir. 2003). For example, in *Zaccagnini*, after being laid off pursuant to a reduction-in-force, the employer offered two inconsistent reasons for not re-hiring the plaintiff-employee. *Zaccagnini,* 340 F.3d at 677. First, the employer maintained that the employee was not rehired because the company had a policy not to rehire workers who had been laid off. *Id.* Later, in its reply brief, the employer provided that it did not rehire the employee because the employee's union did not refer him. *Id.* at 677-78. As a

result, the court found the employer's late reliance on the new explanation "fishy." *Id.* at 678. *See also Mudron v. Brown & Brown, Inc.,* 03 C 8708, 2005 WL 3019414, at *5 (N.D. Ill. Nov. 8, 2005) (analyzing *Zaccagnini* and finding it inapplicable where the employer's proffered reasons for the employee's termination varied in specificity, but were not incompatible or inconsistent). Similarly, in *Appelbaum,* when the supervisor first advised the employee of his termination decision, the supervisor noted that "that [the employee] was being discharged for both her allegedly poor performance and for [a] confidentiality breach." *Appelbaum*, 340 F.3d at 579. However, at trial, "not only did [the employer] abandon the charge of poor work performance, but [the supervisor] went so far as to say it played 'zero role' in [the employee's] termination." *Id.* Accordingly, the court indicated that one could reasonably infer pretext based on the employer's departure from the previously articulated rationale. *Id.*

Under the facts as presented by Parnell, Homewood has not taken an *inconsistent* position with respect to its reasons for demoting Parnell such as those found in *Culver, Zaccagnini* and *Appelbaum.* Rather, in support of summary judgment, Hometown merely *elaborated* upon existing reasons, naming two additional reasons for its decision to demote Parnell which supplement those found in the EEOC Position Statement. While *Culver* and its predecessors deny employers the ability to assert contradicting reasons for an adverse employment action, they do not take away an the ability to "elaborate on the reasons for an adverse employment action once litigation has commenced." *Culver*, 416 F.3d at 549 (citing *Perfetti v. First Nat. Bank of Chicago,* 950 F.2d 449, 457 (7th Cir. 1991)). As a result, the Court declines Parnell's invitation to find pretext based on Hometown's submission of additional and consistent reasons for Parnell's demotion.

Second, Parnell contends that he "has produced ample evidence" that contradicts

-25-

Hometown's position that Parnell participated in manipulating invoices, arguing further that the "record does not support Hometown's position that Parnell's subordinates ever lost confidence in him." Pl.'s Resp. Mot. Summ. J. at 7-8. However, such contentions address a supplemental issue not before the Court, *i.e.*, whether Hometown's beliefs were correct.[10] As the Seventh Circuit has noted, the issue in evaluating an employer's reason for an adverse employment action "is not whether an employer's evaluation of the employee was correct but whether it was honestly believed." *Culver*, 416 F.3d at 547 (citing *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001)). In fact, the "employer's explanation can be 'foolish or trivial or even baseless' so long as it 'honestly believed' the proffered reasons for the adverse employment action." *Id.* (quoting *Hartley v. Wisc. Bell, Inc.*, 124 F.3d 997, 890 (7th Cir. 1997)). Because Parnell's "ample" evidence does not address the issue of whether Hometown "honestly believed" in its proffered reasons, this Court will not second guess those reasons. *See Ajayi*, 336 F.3d at 532 (noting that courts are not a "super personnel review board").

Third, Parnell also finds problematic the fact that Hometown cited as a reason for his demotion its belief that Parnell manipulated sales invoices when Hometown previously reprimanded him for such conduct on February 11, 2003. Pl.'s Resp. Mot. Summ. J. at 7-8. Thus, Parnell appears to be challenging the degree of his punishment for sales invoice manipulation. While the Seventh

---

[10]Moreover, it is suspect whether Parnell's "evidence," which he argues contradicts Hometown's position that Parnell participated in manipulating invoices, operates in the way he says it does. In fact, most of Parnell's citations to the record, even if taken as true, simply establish that he was instructed as to how to manipulate invoices and did not believe that process was wrong or detrimental to Hometown. *See, e.g.*, Pl.'s LR 56.1(b)(3)(B) ¶ 44 ("Hollis then proceeded to explain the process of how to manipulate the sales invoices to increase distribution to Parnell . . . ."); *id.* ¶ 46 ("When Parnell instructed his employees [as to the manipulation scheme], he did not believe that either he or his sales team were cheating Hometown in any way."); *id.* ¶ 73 ("Parnell had no knowledge that changing the sales invoices was wrong until the meeting with Taylor.").

Circuit has held punishment that is "grossly excessive" in light of the alleged infraction may cast doubt on an employer's reason for a termination, see *Stalter v. Wal-Mart Stores, Inc.,* 195 F.3d. 285, 290 (7th Cir. 1999), this Court declines to find the demotion as "grossly excessive."[11]

In Parnell's statement of additional facts, he recognized that Hometown's owners considered the invoice manipulation to have potentially serious ramifications, potentially jeopardizing Hometown's relationship with one of its suppliers and subjecting it to fines from the State of Illinois. *See* Pl.'s LR 56.1 (b)(3)(B) ¶ 68. As a result, the seriousness of the conduct sets this case apart from cases like *Stalter,* where an employer terminated an African-American employee for theft after he took a handful of taco chips from an open bag in the employee break room. *Stalter,* 195 F.3d at 290. Moreover, to the extent Parnell personally disagrees with the extent of his punishment, that disagreement is not pertinent to the Court's analysis. *Cf. Peters v. Renaissance Hotel Operating Co.,* 307 F.3d 535, 549 (7th Cir. 2002) (noting that "[m]ere subjective belief - without the backing of hard evidence - cannot prove that an action was inspired by improper motivations").

Finally, Parnell adds that "he was not disciplined between April 7, 2003 and June 3, 2005 [sic] while Hometown had a system of progressive discipline under its Employee Handbook." Pl.'s Resp. Mot. Summ. J. at 8. While it is unclear what exactly Parnell argues here, it appears that Parnell is simply arguing for an inference of pretext based on Hometown's failure to follow its progressive discipline policy. Even if Hometown had a progressive discipline policy as set forth in

---

[11]While the Seventh Circuit has found "grossly excessive" punishment as evidence which may permit an inference of pretext, see *Stalter,* 195 F.3d at 285, the Court notes its hesitation in performing such a determination. Whether an employer's chosen punishment for an employee's actions is excessive (and therefore evidence of pretext), necessarily calls for a subjective evaluation that could potentially and impermissibly impose federal court review on corporate personnel department decisions. *See Ajayi,* 336 F.3d at 532 (noting that courts are not a "super personnel review board").

its employee handbook, a fact disputed by Hometown, Hometown would not be required to follow it. *See Anderson v. Stauffer Chem. Co.,* 965 F.2d 397, 403 (7th Cir.1992) (holding that an employer with a progressive discipline policy is not required to use it). *See also Barakat v. Taco Bell, Inc.,* 970 F.Supp. 634, 640 (N.D. Ill. 1997) ("The fact that an employer did not follow a progressive discipline program, without some doubt raised as to his genuineness for not doing so, fails to demonstrate pretext.") (citing *Anderson,* 965 F.2d at 403). Accordingly, because the Court finds that Parnell has not demonstrated that Hometown's proffered reasons for his demotion were a lie, summary judgment is appropriate as to the issue of his demotion.

**B.    *Parnell's Termination.***

As a final matter, the Court turns to the issue of whether Parnell can establish that Hometown's reasons for his termination are pretext. Parnell offers many of the same arguments he submitted in connection with his arguments for pretext as to his demotion. Again, Parnell argues that Hometown has changed its story as to the reasons offered by Hometown for Parnell's termination, contending Hometown has given "different" versions of its reasoning behind its decision to terminate Parnell and that Hometown did not follow its system of "progressive discipline." Pl.'s Resp. Mot. Summ. J. at 8. However, these arguments fail to the extent they are the same as previously submitted in connection with his demotion arguments. As noted, Hometown has not offered incompatible or inconsistent reasons for his termination. Instead, the versions are consistent and based on Parnell's early departure from work on June 3, 2003 and Hometown's belief Parnell participated in manipulating sales invoices. *Compare* Pl.'s LR 56.1(b)(3)(B) ¶ 205 *with* Def.'s LR 56.1(a)(3) ¶ 65. Moreover, with respect to Hometown's discipline system, again, the fact Hometown did not follow it does not support pretext under the facts presented. *See supra* at 27-28

(discussing the effect of a failure to follow a stated discipline system).

Though the Court finds that Hometown has not offered inconsistent reasons for Parnell's termination, this finding does not mean that those reasons had a basis in fact, actually motivated Hometown's decision or were sufficient to motivate its decision. *Grayson,* 308 F.3d at 820. In discussing Hometown's articulated reasons for his termination, Parnell pointed out that Hometown terminated him "because *he never showed up* on June 4th" such that he "abandoned his job." Pl.'s Resp. Def.'s Mot. Summ. J. at 9 (citing Def.'s LR 56.1(a)(3) ¶ 65) (emphasis in original). *See also* Pl.'s LR 56.1(b)(3)(B) ¶ 220 (citing the testimony of Hometown's human resources manager, Diana Ascencio, who commented that after Parnell's termination, she prepared a spreadsheet listing both Hometown's active and terminated employees, which listed the reason for Parnell's termination as "MISCONDUCT - JOB ABANDONMENT"). However, a review of Parnell's statement of additional facts, pointing to evidence showing that Parnell did not abandon his job, and Hometown's responses thereto, directly contradicts Hometown's reasoning behind Parnell's termination. For example, when Parnell contended that he "went to work on the morning of June 4, 2003," Hometown responded simply: "Admit." Pl.'s LR 56.1(b)(3)(B) ¶ 186; Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) ¶ 186. Similarly, Hometown admitted that after attending a meeting at Hometown on the morning of June 4, 2003, Parnell went to visit various accounts with David Hawash and that as Parnell was working with Hawash, he received a phone call from Toliver regarding Parnell's laptop computer. *Id.* ¶ 191. Thus, as admitted by Hometown, Parnell was at work on June 4, 2003.

Similarly, any assertion that Parnell abandoned his job for a several day period is likewise not supported by the record. During Bell's deposition, counsel sought to clarify when Hometown decided to terminate Parnell. Bell Dep. at 173. Bell testified that it was "[a]fter he didn't come back

to work for a certain time period." *Id.* Though he could not recall an exact date on which the termination decision was made, Bell remembered that Parnell "*was out for a number of days and we couldn't reach him*" adding "at that point, you know, our decision was, well, to terminate him because he's not coming in and we can't reach him without an excuse." *Id.* at 174 (emphasis added). Thereafter, when asked if the reason Parnell was terminated "was because he wasn't coming into work and you couldn't get ahold [sic] of him," Bell replied "That's correct." *Id.*

However, as noted above, Parnell asserted and Hometown admitted that Parnell was at work on June 4, 2003. Moreover, while Parnell was absent from work on June 5th and June 6th, Parnell testified that he (or his wife on his behalf) called in sick on both days. Pl.'s LR 56.1(b)(3)(B) ¶¶ 192, 197. As with his alleged "absence" on June 4, 2003, Hometown admitted receiving Parnell's messages in Taylor's voice mail on the morning of June 5, 2003 regarding an absence for that day as well as a message on evening of June 5, 2003 regarding an absence for June 6, 2003. Defs.' Resp. Pl.'s LR 56.1(b)(3)(B) ¶¶ 192, 197. Though Hometown admits that Taylor received Parnell's messages, Hometown asserts that the messages were received "after the decision to terminate Parnell was made on June 4, 2003." Defs.' Resp. Pl.'s LR 56.1(b)(3)(B) ¶ 195 (citing Taylor Dep. at 63-64). Yet, this position is directly contradicted by testimony from Hometown's other decisionmaker, Bell, who noted that the decision to terminate Parnell was made *after* Parnell "was out for a number of days and we couldn't reach him." Bell Dep. at 173. This inconsistency creates a genuine issue of fact as to whether Hometown's stated reason for discharging Parnell was a pretext for discrimination. As a result, this creates a factual issue which would be properly resolved by a trier of fact. *See Grayson*, 308 F.3d at 820 (noting that a plaintiff must demonstrate that an employer's "articulated reason for its actions . . . had no basis in fact . . . ."). *See also Lust v. Sealy, Inc.*, 277 F.Supp.2d 973,

-30-

991 (W.D.Wis.,2003) (finding, in ruling on a Rule 50(b) motion for judgment as a matter of law, that the "plaintiff presented sufficient evidence to allow the jury to conclude reasonably [that a secondary explanation offered by an employer] was pretextual" where the employer's belief was called into question by the employer's own testimony at trial"). Accordingly, summary judgment is denied as to the issue of his termination.

## Conclusion

For the reasons provided above, Hometown's motion for summary judgment is granted in part and denied in part. Parnell may proceed to trial on the issue of whether his termination was made in retaliation to activity protected by federal civil rights law.

**ENTER:**

**DATED:**   FEB  7 2006

**UNITED STATES DISTRICT JUDGE**